**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| VIASAT, INC., <br>          Plaintiffs, <br><br>    *v.* <br><br> WESTERN DIGITAL TECHNOLOGIES, INC., <br>          Defendant. | **6:21-CV-01230-ADA** <br><br> **JURY TRIAL DEMANDED** |

## MEMORANDUM OPINION AND ORDER

Came on for consideration this date is Defendant Western Digital Technologies, Inc.'s Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) to the Northern District of California (the "Motion"). ECF No. 69. Plaintiff Viasat, Inc., filed an opposition on November 10, 2022, ECF No. 90, to which Western Digital Technologies, Inc. replied on November 23, 2022. ECF No. 62. After careful consideration of the Motion, the Parties' briefs, and the applicable law, the Court **DENIES** Western Digital Technologies, Inc.'s Motion to Transfer Venue to the Northern District of California.

## I. BACKGROUND

Plaintiff Viasat, Inc. ("Viasat") filed this suit accusing Defendant Western Digital Technologies, Inc. ("WDT") of infringing U.S. Patent Nos. 8,615,700 (the '700 patent) and 8,966,347 (the '347 patent) (collectively, the "Asserted Patents"). ECF No. 1 at 2–3. The Asserted Patents relate to an improved architecture for error correction in flash. *Id.* ¶ 4. Viasat accused WDT of infringing through its use of products that implement the patents' error-correction architecture. *Id.* ¶ 8. Specifically, Viasat accuses WDT's NAND-flash-memory-containing products, all of which Viasat alleges include WDT's "proprietary Sentinel ECC&DSP technology." *Id.* Viasat explains that the allegedly infringing products include flash memory enterprise solutions for

1

"Data-Centric Architectures" sold under the brand names Western Digital, G-Technology, SanDisk, Ultrastar, WD, Cloudspeed, iNAND, and OpenFlex (the "Accused Products"). *Id.* ¶ 9.

## II. LEGAL STANDARD

In patent cases, motions to transfer under 28 U.S.C. § 1404(a) are governed by the law of the regional circuit. *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008). Title 28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

"The preliminary question under § 1404(a) is whether a civil action 'might have been brought' in the [transfer] destination venue." *In re Volkswagen, Inc.*, 545 F.3d 304, 312 (5th Cir. 2008) ("*Volkswagen II*"). If the destination venue would have been a proper venue, then "[t]he determination of 'convenience' turns on a number of public and private interest factors, none of which can be said to be of dispositive weight." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004). The private factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*") (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1982)). The public factors include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law

that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law." *Id*. When analyzing these factors, courts may consider facts arising after plaintiff filed suit unless there is some suggestion that they arose primarily to affect the transfer analysis. *See Lynk Labs, Inc. v. Home Depot USA, Inc.*, No. 6:21-CV-00097-ADA, 2022 WL 1593366, at *6 (W.D. Tex. May 19, 2022) (explaining how post-complaint facts must be disregarded when considering § 1404(a)'s preliminary question, but not when evaluating convenience); *In re: NetScout Sys., Inc.*, No. 2021-173, 2021 WL 4771756, at *4 (Fed. Cir. Oct. 13, 2021) (disregarding, under the practical-problems factor, later-filed cases in the transferor district).

The weight the Court gives to each of these assorted convenience factors will necessarily vary from case to case. *See Burbank Int'l, Ltd. v. Gulf Consol. Int'l, Inc.*, 441 F. Supp. 819, 821 (N.D. Tex. 1977). A court should not deny transfer where "only the plaintiff's choice weighs in favor of denying transfer and where the case has no connection to the transferor forum and virtually all of the events and witnesses regarding the case . . . are in the transferee forum." *In re Radmax, Ltd.*, 720 F.3d 285, 290 (5th Cir. 2013).

The burden to prove that a case should be transferred for convenience falls squarely on the moving party. *In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010). The burden that a movant must carry is not that the alternative venue is more convenient, but that it is *clearly* more convenient. *Volkswagen II*, 545 F.3d at 314 n.10. While "clearly more convenient" is not explicitly equivalent to "clear and convincing," the movant "must show materially more than a mere preponderance of convenience, lest the standard have no real or practical meaning." *Quest NetTech Corp. v. Apple, Inc.*, No. 2:19-cv-118, 2019 WL 6344267, at *7 (E.D. Tex. Nov. 27, 2019). The

Federal Circuit has clarified that, for a court to hold that a factor favors transfer, the movant need not show that factor *clearly* favors transfer. *In re Apple Inc.*, 979 F.3d 1332, 1340 (Fed. Cir. 2020).

## III. ANALYSIS

As an initial matter, the Court finds that WDT's primary venue deponent, Idan Alrod, lacks credibility. WDT first designated David A. Carter on several venue deposition topics, including employees who live or work in this District. *See* ECF Nos. 90-14; 90-33. Viasat points to Mr. Carter's deposition testimony, though, to show that Mr. Carter was not prepared to discuss the Accused Products for which the Court ordered WDT to provide discovery; the work performed by employees in this District; or the status of former employees who currently reside here. ECF No. 90-3 at 33:19-22; 43:4-16; 52:25-53:15; 71:2-19; 82:11-83:7; 88:2-89:11; 90:15-92:13. Mr. Alrod, WDT's other venue deponent, similarly was unprepared for his deposition. Mr. Alrod initially admitted that some of his testimony was based on a serious of unproduced emails. ECF No. 90-1 at 46:13-48:10; 57:5-25. WDT produced more documents between the time that Mr. Alrod's deposition began and the day after his deposition ended than it had produced before the deposition, leaving limited time for Viasat to adequately review the material and properly prepare for Mr. Alrod's deposition. ECF Nos. 90-15; 90-16. Indeed, Mr. Alrod referred to unproduced documents and searched the internet to help during his deposition. ECF No. 90-1 at 71:3-22, 119:18-120:21, 131:3-133:6, 188:2-190:8; ECF No. 90-2 at 354:16-355:3.

Notably, Mr. Alrod also admits he did not review a list of the Accused Products until he did so "briefly" the morning of the deposition and could not answer certain questions because of this. ECF No. 90-1 at 60:24-61:12; 130:7-17; ECF No. 90-2 at 350:9-352:23. He did not investigate the location of certain physical documents, nor did he know where relevant documents were actually stored. ECF No. 90-1 at 115:22-116:4; 95:6-97:15; 98:4-14. He testified that certain companies WDT had acquired were not relevant, but then admitted he had not actually investigated

this fully. *Id.* at 91:12-92:11; ECF No. 90-2 at 349:13-355:3; 280:9-282:24; 325:14-17; 349:13-355:3, 356:25-357:24; 365:15-372:19. He also limited his investigation into WDT's current employees in this District to those who had worked specifically on the error correction code ("ECC") functionality, and not on the Accused Products generally. ECF No. 90-1 at 94:19-95:5, 123:7-124:5, 186:4-18; ECF No. 90-2 at 349:13-353:24; 463:13-25. This fails to provide a sufficient basis for the Court to know whether relevant witnesses, documents, and information exist in this District.

Mr. Alrod's lack of preparedness and his failure to investigate undercuts any credibility his testimony would otherwise be entitled to. Accordingly, the Court accords minimal weight to Mr. Alrod's testimony.

### A.      Venue and Jurisdiction in the Transferee Forum

To satisfy § 1404(a)'s preliminary question, the movant must show that venue and jurisdiction would have been proper in the transferee forum when the plaintiff filed suit. *See Monolithic Power Sys., Inc. v. Meraki Integrated Cir. (Shenzhen) Tech., Ltd.*, No. 6:20-CV-00876-ADA, 2022 WL 958384, at *5 (W.D. Tex. Mar. 25, 2022). The Court finds, and the parties do not contest, that this Action could have been brought in the NDCA. WDT is headquartered in the NDCA. ECF No. 69 at 1. Thus, Venue is proper in the NDCA, because the NDCA may exercise personal jurisdiction over Microsoft. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Because Viasat could have filed this case in the NDCA, the Court must consider the private and public interest factors. *Volkswagen II*, 545 F.3d at 315.

### B.      Private Interest Factors

####       1.   Cost of Attendance and Convenience of Willing Witnesses

The most important factor in the transfer analysis is the convenience of the witnesses. *See In re Genentech, Inc.*, 566 F.3d 1338, 1343 (Fed. Cir. 2009). The Fifth Circuit has established the

"100-mile rule," providing that "[w]hen the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen I*, 371 F.3d at 204–05. Yet the Federal Circuit has refused to apply the rule "rigidly," such as where it may "result in all identified witnesses having to travel away from their home and work in order to testify in Texas, which would 'produce results divorced from' the rule's underlying rationale." *In re Google LLC*, No. 2021-170, 2021 WL 4427899, at *5 (Fed. Cir. Sept. 27, 2021) (quoting *In re TracFone Wireless, Inc.*, 852 F. App'x 537, 539 (Fed. Cir. 2021)). This has led the Federal Circuit to disregard distance altogether in favor of considering travel-time statistics. *See In re Google LLC*, 2021 WL 4427899, at *12 ("[T]ime is a more important metric than distance."). Or to simply disregard any difference in convenience between the relevant fora where it is comfortable concluding that a witness would have to travel a significant distance no matter if the action is transferred or not. *See In re Apple*, 979 F.3d at 1342 (discussing witnesses traveling from New York to either Texas or California venues); *In re Genentech, Inc.*, 566 F.3d at 1344 (stating that the 100-mile rule should not be "rigidly" applied in the context of foreign witnesses); *In re Pandora Media, LLC*, No. 2021-172, 2021 WL 4772805, at *6 (Fed. Cir. Oct. 13, 2021). It has even gone as far as opining that "[t]he comparison between the transferor and transferee forum is not altered by the presence of other witnesses and documents in places outside both forums." *In re Toyota Motor Corp.*, 747 F.3d 1338, 1340 (Fed. Cir. 2014); *In re Google LLC*, No. 2021-170, 2021 WL 4427899, at *4 (Fed. Cir. Sept. 27, 2021).

In its Motion, WDT asserts that this factor overwhelmingly favors transfer to the NDCA because the vast majority of U.S.-based party and third-party witnesses are in or closer to the NDCA, rendering the cost of traveling to this District—monetary and personal—considerably

higher than traveling to NDCA. ECF No. 69 at 11. First, the Court acknowledges that WDT asserts that ten third-party witnesses reside in the NDCA, including a prosecuting attorney of record, at least three individual prior art witnesses, at least four entities that developed likely prior art systems, and two former Western Digital employees who played roles in developing products that embody the Accused Functionality. *Id.* But the Court will not double count witnesses under multiple factors. *See In re Apple Inc.*, 979 F.3d 1332, 1340 (noting that if witness convenience was considered when assessing two of the private interest factors, "witness convenience will be inappropriately counted twice"). Because WDT gives no indication that these non-party witnesses are willing, the Court will evaluate these witnesses under the "compulsory process" factor. *See In re HP Inc.*, No. 2018-149, 2018 WL 4692486, at *3 n.1 (Fed. Cir. Sept. 25, 2018) ("when there is no indication that a non-party witness is willing, the witness is presumed to be unwilling and considered under the compulsory process factor.").

WDT, however, identifies ten WDT party witnesses with knowledge relevant to the development, manufacturing, marketing, and sales of the Accused Functionality and the products that embody it in the NDCA, as well as a witness who resides close to NDCA in Roseville, California. ECF No. 69 at 2, 11.[1] Among those witnesses are six engineers and three witnesses on the marketing, sales, and finance teams who are familiar with the products that embody the Accused Functionality. ECF No. 69 at 2-3; ECF No. 69-2 ¶¶ 4-20. WDT asserts that trial would be more convenient for these witnesses in the NDCA. It also asserts that Viasat's ties to this District

---

[1]WDT, and Mr. Alrod, also refer generally to witnesses with relevant knowledge in Israel. ECF No. 69 at 1; ECF No. 69-2 ¶¶ 4, 15. The Court accords these witnesses little to no weight. *Se In re Genentech, Inc.*, 566 F.3d at 1344; *see also AudioEye, Inc. v. accessiBe Ltd.*, No. 6:20-CV-997-ADA, 2022 WL 827805, at *6 (W.D. Tex. Mar. 9, 2022) (reducing weight for witnesses traveling from Israel).

are minimal, and that its witnesses will likely be traveling from Viasat's San Diego headquarters or its NDCA office. ECF No. 69 at 12. Because of this, it contends that the NDCA would also be more convenient for Viasat's witnesses, as flights from San Diego to NDCA are shorter than to this District and Viasat's San Jose witnesses are within a 30-minute to 1-hour drive to three NDCA courthouses. *See* ECF No. 70 ¶¶ 37, 39; ECF Nos. 70-39; 70-41.

WDT also points to Viasat's corporate headquarters in the San Diego, California area, along with Viasat's NDCA office to contend that this supports transfer to the NDCA. ECF No. 68 at 4. Viasat, in its Response, claims only that it has a "substantial" presence in this District because it maintains an Austin office that supports over twenty employees. ECF No. 90 at 2. Viasat does not specifically identify any of its employees in this District, nor does it contest WDT's identification of Viasat's employees in California. Even still, WDT has the burden to prove that venue is clearly more convenient for WDT, not for Viasat.

In its Motion, WDT concedes that Viasat identified four WDT employees located in its Austin office- Robert Golla, Srini Vemuir, Scott Glenn, and Rick Vasquez. ECF No. 69 at 3. It explains that Mr. Golla and Mr. Vemuir have since left the company but were engineers who worked solely on technology that is "wholly unrelated" to the Accused Functionality. *Id.* But WDT does not contest that Mr. Glenn and Mr. Vasquez are relevant; it contends only that they do not have any "unique" information and that other employees in the NDCA, like their superiors, have "at least the same or better knowledge." *Id.* at 4; ECF No. 69-2 ¶ 20. The Court is not persuaded by this argument. The Court is not obligated to accept Mr. Alrod's self-serving allegation that Mr. Glenn and Mr. Vasquez have "unique" knowledge. Given that WDT concedes they have relevant and material knowledge, the Court will weigh their convenience in its analysis.

In its Response, Viasat contends that WDT has 28 employees in this District and that they are involved in various functions relating to the Accused Products, including engineering, customer-support and sales, and often interface with major customers like Dell, for whom Western Digital markets, integrates, and supports the accused products in the District. ECF No. 90 at 2; ECF No. 90-3 at 58:18-59:19. Viasat elicits testimony from Mr. Carter that five employees in Austin are involved in the sales and marketing of the Accused Products. ECF No. 90-3 at 58:2-59:19. Mr. Alrod also concedes that WDT maintains sales and customer support teams in this District with responsibilities related to the Accused Products. EC No. 69-2 at 452:23-453:17; 464:2-465:9. These teams travel to WDT customers in this District to evaluate issues that arise with the Accused Products and maintain a "special channel" that monitors the reliability of the Accused Products. ECF No. 90-1 at 155:16-21; ECF No. 90-2 at 465:20-466:22. Mr. Alrod also confirmed that WDT has a team of four people based in Austin that consists of field-application engineers. ECF No. 90-1 at 207:25-209:9.

Only after Viasat identifies the sales, customer support teams, and field-application engineers in this District does WDT address them in its argument. While WDT maintains that no members of the sales or customers service teams in Austin have relevant knowledge, it identifies Cassandra Bailey, a member of the sales team in the NDCA as a "key" witness and provides no other explanation for why the sales employees in Austin should not be considered relevant, given their responsibilities related to the Accused Products. WDT only asserts that members of the marketing, sales, and finance teams who are familiar with the "products that embody the Accused Functionality" are in WDT's offices in the NDCA. ECF No. 69 at 3. Mr. Alrod also admitted that he talked to a field application engineer, Kevin Li, but "didn't investigate" more into his job duties after talking to him only about the ECC technology. ECF No. 90-1 at 207:25-208:15.

9

Mr. Alrod refers to WDT's Austin-based employees generally in his declaration, only disclosing that he was "informed" and "believe[s]" that there are no employees with knowledge relevant to the Accused Functionality located in Austin. ECF No. 69-2 ¶ 7. He does not expand on this, yet he maintains that he has not worked with WDT's employees in this District, and to the extent they even have relevant knowledge, WDT's employees in the NDCA have at least "the same or better knowledge." *Id.* ¶ 7. Yet Mr. Alrod limited his investigation into WDT current employees in this District to those who had worked on certain technical aspects of ECC functionality, ignoring these employees' other job duties, the location of their documents, and their work on other aspects of the infringing technologies. ECF No. 90-1 at 94:19-95:5, 123:7-124:5, 186:4-18; ECF No. 90-2 at 349:13-353:24; 463:13-25. WDT, in its Reply, counters that its "handful of Texas-based employees" have nothing to do with the Accused Products, and that those employees possess "peripheral, if any, information pertaining to this case." ECF No. 95 at 1. The Court is thus left without a sufficient basis to know whether Mr. Alrod's assertion that these employees are not relevant, or even if they are, that the NDCA employees have the "same or better knowledge," is true. The Court cannot now weigh any potentially missing information regarding relevant employees in this District in its analysis.

Viasat also asserts that WDT's "venue-motivated identification of witnesses" is shown by the fact that Mr. Alrod's declaration is inconsistent with WDT's project database. ECF No. 90 at 2, 9. Six of the eight technical people Mr. Alrod identified as key witnesses were not on the list produced by WDT that named the individuals involved with the developing of the controllers containing the accused ECC technology. ECF No. 90-21. Mr. Alrod could not explain this inconsistency in his deposition. ECF No. 90-1 at 227:16-229:12. Viasat also identified Randy Hurdle, a WDT Project Management Engineer with job description "Manager 5" who resides in

this District and works in the Flash Business to characterize and test flash products. ECF No. 90 at 16; ECF No. 90-8. Mr. Alrod tried to diminish Mr. Hurdle's relevancy, but Mr. Hurdle is listed as a project member on one of the controller projects in the technical documents, unlike some of the NDCA witnesses identified by Mr. Alrod in his declaration. ECF No. 90-21 at 69. Mr. Hurdle's position as PMO was identical to fellow listed project team member ██████ ███████ in Israel, who WDT included as a person involved in the design of the controllers. *Id.* at 14; ECF No. 90-2 at 401:6-24. The Court finds it reasonable to infer that Mr. Hurdle has relevant knowledge.

WDT replies that Viasat seeks to discount the numerous WDT witnesses with relevant and material information located in the NDCA by arguing that WDT's identification was unreliable, that certain activity occurred in Israel, and by pointing to a handful of WDT employees in the WDTX, and that such arguments misrepresent the record and relevant issues. ECF No. 95 at 7. WDT cites *In re Netflix, Inc.* in support to contend that "[t]he comparison between the transferor and transferee forums is not altered by the presence of other witnesses and documents in places outside both forums." No. 2022-110, 2022 WL 167470, at *4 (Fed. Cir. Jan. 19, 2022) (quoting *In re Toyota Corp.*, 747 F.3d 1338, 1341 (Fed. Cir. 2014)). But WDT does not explain how this supports the inconsistencies between WDT's project database and Mr. Alrod's testimony, nor does it support Mr. Alrod's failure to even investigate whether relevant witnesses are in this District. WDT reiterates that its "non-existent connections" to this District are "irrelevant," but provides no other evidence apart from Mr. Alrod's uncredible testimony to do so. ECF No. 95 at 6.

*Conclusion.* Because relevant witnesses are in both districts, the Court finds that this factor is neutral.

2.  Relative Ease of Access to Source of Proof

"In considering the relative ease of access to proof, a court looks to where documentary evidence, such as documents and physical evidence, is stored." *Fintiv, Inc. v. Apple Inc.*, No. 6:18-cv-00372-ADA, 2019 WL 4743678, at *5 (W.D. Tex. Sept. 10, 2019). This factor relates to the relative—not absolute—ease of access to non-witness evidence. *See In re Radmax*, 720 F.3d at 288; *In re Apple*, 979 F.3d at 1339. "[T]he movant need not show that all relevant documents are located in the transferee venue to support a conclusion that the location of relevant documents favors transfer." *In re Apple*, 979 F.3d at 1340; *In re Juniper Networks, Inc.*, 14 F.4th 1313, 1321 (Fed. Cir. 2021) ("We have held that the fact that some evidence is stored in places other than either the transferor or the transferee forum does not weigh against transfer.").

The Fifth Circuit has held that, even in the context of electronic documents that can be accessed anywhere on earth, this factor is not superfluous. *See Volkswagen II*, 545 F.3d at 316; *see also In re Dish Network LLC*, No. 2021-182, 2021 WL 4911981, at *6 (Fed. Cir. Oct. 21, 2021). Though having consistently characterized that holding as antiquated in the setting of a modern patent dispute, this Court will continue to analyze this factor with a focus on the location of: physical documents and other evidence; and the hardware storing the relevant electronic evidence. *See Def. Distributed v. Bruck*, 30 F.4th 414, 434 & n.25 (5th Cir. 2022) (giving weight to the location of servers hosting the electronic documents in dispute). The Federal Circuit has held, however, that it is error not to also consider: "the location of document custodians and location where documents are created and maintained, which may bear on the ease of retrieval." *In re Google LLC*, No. 2021-178, 2021 WL 5292267, at *2 (Fed. Cir. Nov. 15, 2021); *see also Def. Distributed*, 30 F.4th at 434 & n.25 (considering, under this factor, where the "research, design, development, manufacturing, and publishing" of the allegedly offending files occurred). Finally,

evidence located at a party's office that is not a "place of regular business" may be discounted. *See In re Google LLC*, No. 2022-140, 2022 WL 1613192, at \*4 (Fed. Cir. May 23, 2022).

WDT contends that this factor favors transfer because the most relevant U.S.-based sources of proof will predominantly come from the NDCA, where the Accused Functionality was designed and developed. ECF No. 69 at 8. It asserts that because the transferee forum is more proximate to relevant third parties to the case (discussed below), that this factor further favors transfer because third-party documents and other materials are "likely" located there. ECF No. 69 at 9. Moreover, WDT claims that neither it nor Viasat are likely to have any documents or other sources of proof located in, or "uniquely accessible from," this District. *Id.*

In its Response, Viasat counters that WDT is largely a paperless company and has not identified any physical documents, and that if a person has the right permissions, WDT's servers can be accessed anywhere. ECF No. 90 at 12–13. Indeed, the Fifth Circuit recently stated, "[t]he location of evidence bears much more strongly on the transfer analysis when, as in *Volkswagen*, the evidence is physical in nature." *In re Planned Parenthood Fed'n of Am., Inc.*, No. 22-11009, 2022 WL 16549164, at \*3 (5th Cir. Oct. 31, 2022). Mr. Alrod also could not confirm where WDT's documents were located because he admits that he did not investigate this. ECF No. 90-1 at 95:6–96:25.

Based on the lack of evidence regarding WDT's storage of hard copies, the Court is not persuaded that the NDCA has more sources of physical proof than this District. There are relevant employees and relevant third parties both in the WDTX and in the NDCA, and so the custodians of relevant documents are in both locations. Viasat's physical documents regarding conception and reduction to practice and its servers are in Cleveland. ECF No. 90 at 12. This does not weigh in favor of or against transfer. *See In re Toyota Motor Corp.*, 747 F.3d 1338, 1340 (Fed. Cir. 2014)

("The comparison between the transferor and transferee forums is not altered by the presence of other witnesses and documents in places outside both forums.").

Yet in its Reply, WDT asserts that it has many servers and data centers in the NDCA, but none in this District. ECF No. 95 at 2. Notably, WDT only addresses the location of its servers after Viasat raises the issue in its Response. WDT cites a document showing the location of its servers in the U.S., which appears to confirm that it has servers in California, ███████████████

███████ ECF No. 95-6. But WDT does not provide any evidence indicating whether any servers in California host relevant documents because Mr. Alrod did not investigate this. ECF No. 90:1 at 63:5-65:7, 82:21- 84:6, 88:10-89:19; ECF No.90-2 at 258:7-262:9. The Court, accordingly, will only attribute some weight to WDT's servers and data centers in the NDCA. *See Def. Distributed v. Bruck*, 30 F.4th 414, 434 & n.25 (5th Cir. 2022) (giving weight to the location of servers hosting the electronic documents in dispute).

WDT also asserts that the Accused Functionality was designed and developed in the NDCA. ECF No. 69 at 8. *See Def. Distributed*, 30 F.4th at 434 & n.25 (considering, under this factor, where the "research, design, development, manufacturing, and publishing" of the allegedly offending files occurred). Viasat accuses WDT of "misleadingly" making this assertion, as it contends that the relevant Accused Functionality- WDT's ECC technology- was designed and developed in Israel. ECF No. 90 at 10. In support, it points to Mr. Alrod's testimony and his statement that "the team that designs and develops [Sentinel] is based in Kfar Saba, Israel." ECF No. 69 at 2. Mr. Alrod described in his deposition how the "core ECC engine" and the source code used to build that engine are designed and developed in Israel. ECF No. 90-2 at 163:17-164:23; 179:15-19. Even though WDT integrates the ECC functionality into WDT's commercial memory products in the NDCA, Viasat contends that the overall design and the simulations to validate the

14

design all occur in Israel. WDT reasserts that only the core ECC algorithms are developed in Israel, and that the vast majority of memory related aspects of the controller occurred in California. ECF No. 95 at 2. The Court agrees with Viasat that the design and development occurred both in the NDCA and in Israel. Mr. Alrod concedes that the core design and development occurred in Israel, thus, sources of proof are also accessible from Israel. Yet, according to the Federal Circuit, this factor is not affected where a substantial amount of evidence resides in Israel. *See In re Toyota Motor Corp.*, 747 F.3d at 1340.

*Conclusion.* The Court finds this factor slightly favors transfer. There are relevant employees and relevant third parties both in the WDTX and in the NDCA, and so the custodians of relevant documents are in both locations. WDT identifies servers located in the NDCA and outside of both districts, but it cannot say with certainty which servers host the relevant documents. WDT concedes that the design and development of the Accused Functionality occurs in both Israel and in the NDCA. Upon balancing the evidence in this District and in the NDCA, the Court finds the relative ease of access to sources of proof slightly favors transfer.

### 3.   Availability of Compulsory Process

Under the Federal Rules, a court may subpoena a witness to attend trial only (a) "within 100 miles of where the person resides, is employed, or regularly transacts business in person"; or (b) "within the state where the person resides, is employed, or regularly transacts business in person, if the person . . . is commanded to attend a trial and would not incur substantial expense." Fed. R. Civ. P. 45(c)(1)(A), (B)(ii); *Gemalto S.A. v. CPI Card Grp. Inc.*, No. 15-CA-0910, 2015 WL 10818740, at *4 (W.D. Tex. Dec. 16, 2015). Under this factor, the Court focuses on non-party witnesses whose attendance may need to be secured by a court order. *Fintiv*, 2019 WL 4743678, at *14 (citing *Volkswagen II*, 545 F.3d at 316). This factor "weigh[s] heavily in favor of transfer when more third-party witnesses reside within the transferee venue than reside in the transferor

venue." *In re Apple, Inc.*, 581 F. App'x 886, 889 (Fed. Cir. 2014). When "there are several witnesses located in the transferee forum and none in the transferor forum," this factor favors transfer. *In re Google*, No. 2021-171, 2021 WL 4592280, at *5 (Fed. Cir. Oct. 6, 2021). Further, this Court cannot "discount" third-party "entities" having pertinent information in the transferee venue "just because individual employees were not identified." *In re Apple Inc.*, No. 2021-181, 2021 WL 5291804, at *8 (Fed. Cir. Nov. 15, 2021) (quoting *In re HP Inc.*, 826 F. App'x 899, 903 (Fed. Cir. 2020)).

The Federal Circuit has held that, under Fifth Circuit law, "when there is no indication that a non-party witness is willing, the witness is presumed to be unwilling and considered under the compulsory process factor." *In re HP Inc.*, No. 2018-149, 2018 WL 4692486, at *3 n.1 (Fed. Cir. Sept. 25, 2018); *see also In re Hulu, LLC*, No. 2021-142, 2021 WL 3278194, at *4 (Fed. Cir. Aug. 2, 2021) ("[W]here . . . the movant has identified multiple third-party witnesses and shown that they are overwhelmingly located within the subpoena power of only the transferee venue, this factor favors transfer even without a showing of unwillingness for each witness").

WDT argues that this factor favors transfer because the NDCA is more convenient for third-party witnesses, "all of whom are located outside the subpoena power of this Court." ECF No. 69 at 6. It identifies ten third-party witnesses that reside in the NDCA, including a prosecuting attorney of record, three individual prior art witnesses, four entities that developed likely prior art systems, and two former Western Digital employees who played key roles in developing products that embody the Accused Functionality. ECF No. 69 at 11.

WDT identifies three specific third-party individuals and entities with knowledge of potential prior art systems based in NDCA. ECF No. 69 at 6-7. It asserts that LingQi Zeng, Director at SK Hynix Memory Solutions, Inc., has worked on ECC and (LDPC (low-density parity-check

code) related technologies for hard disk drives. *Id.* at 6. Bill Radke, former Director of System Engineering at Micron Technology "[o]ptimized & verified NAND behaviour [sic] algorithm development & validation, and recovery strategies including ECC and DSP [digital signal processing]." *Id.* Ravi Motwani, Senior Principal Engineer at Intel Corp., has worked on "ECC/DSP for NAND Flash Memory" since 2010. *Id.*

Viasat argues that these prior art witnesses are entitled no weight. ECF No. 90 at 9 (citing Fintiv, Inc. v. Apple Inc., No. 6:18-CV-00372- ADA, 2019 WL 4743678, at *5 (W.D. Tex. Sept. 13, 2019) ("[P]rior art witnesses are very unlikely to testify (and [parties] may have cherry picked them to begin with")). While WDT asserts only that these are "potential" prior art systems, the Court will not disregard these prior artists altogether. *See In re Juniper Networks, Inc.*, 14 F.4th at 1319. The Court accords these prior artists some weight, though it discounts them because they rarely appear at trial. *See In re Hulu, LLC*, 2021 WL 3278194, at *3.

The prosecuting attorney of record for the '700 patent also appears to be in the NDCA, according to WDT. ECF No. 69 at 4. WDT does not explain why the prosecuting attorney would provide any relevant knowledge not otherwise maintained by willing witnesses, but Viasat does not challenge WDT's assertion. The Court will thus accord some weight to this witness.

WDT also identifies former SanDisk Technologies LLC ("SanDisk") and WDT employees in the NDCA who have knowledge relevant to the Accused Functionality, as well as related work predating the Asserted Patents that is relevant to invalidity. *Id.* While WDT asserts that "several" former employees are in the NDCA, it only specifically names two engineers who it alleges worked to ensure the proper integration of the Sentinel Technology into products that embody the Accused Functionality. ECF No. 69-2 ¶ 16. Mr. Walsh worked to ███████████████████████████████ ████████ and, for example, ████████████████████████████████████████████. *Id.*

Mr. Dusija worked ████████████████████████████████████████

████████████████████████ and, for example, ████████████████████████████

██████. *Id.* Viasat does not contend that these former employees are relevant. Thus, the Court

accepts that these witnesses likely have relevant and material information.

On the other hand, Viasat contends that it has identified ten former WDT employees who

are in this District and appear to have relevant evidence. ECF No. 90 at 6. Viasat provides evidence

that WDT produced a document that it said contained all former employees located in Texas, and

these former employees were not listed. ECF No. 90-19. Viasat cites LinkedIn to show that these

witnesses are in this District. ECF No. 90 exhibit 18. This is generally not enough to show that

these witnesses possess knowledge relevant to the alleged infringement. *In re Google LLC*, 2021

WL 4427899, at *7 (allocating no weight to a potential witness that the plaintiff found on LinkedIn

because plaintiff "was not at all specific about what testimony it expected to elicit from [that

witness], or even if he possesses knowledge of the facts relevant to this infringement action").

Viasat, though, elicits some testimony from Mr. Alrod about these individuals. For example,

Viasat identifies Mr. Luo as a former employee who developed enterprise SSD controller ASICs

for HGST (now part of WDT) and alleges that he performed the same type of technical work that

WDT says is performed exclusively by "relevant" individuals in California. ECF No. 90-2 at

347:13-348:4; 355:20-356. But Mr. Alrod explains that he didn't investigate HGST or any of these

potentially relevant individuals because he claims they had no involvement with the relevant

accused technology.

As with WDT's sales and customer service teams in this District, only after Viasat

identifies the former employees in this District does WDT address them in its argument. WDT

replies that Viasat discusses and asserts relevance as to only eight of WDT's former employees in

this District, and that Viasat's argument fails because it never argues that any "evidence" these former employees may have is material or "unique." ECF No. 95 at 3. WDT further attempts to explain that even if these witnesses have relevant knowledge, that knowledge would be "duplicative of and dwarfed by information possessed by NDCA witnesses." *Id.* at 4. For example, WDT points to Mr. Alrod's testimony where he explains that Mr. Luo worked with HGST, and that HGST has "nothing to do with any of the accused products." ECF No. 90-2 347:24-348:4. But when asked about whether Mr. Alrod looked through the list of Accused Products to determine whether any of them represented legacy HGST products, Mr. Alrod again reiterated that he did not look at any of the Accused Products, only the controllers. ECF No. 90-2, 350:9-351:14. Even limiting his investigation into the controllers, though, Mr. Alrod admits that he did not determine what specific controllers each of those Accused Products used. *Id.* at 351:23-352:23. Instead, he explains that he "asked mapping" to tell him what the relevant controllers were for each product, but that he "didn't get that mapping." *Id.* He further admits that, after a "brief" look at the list, it "seems" that all the ███████████████████████████ but "maybe there is just one or two that needs to be verified." *Id.* This failure to adequately investigate Accused Products severely undercuts and raises serious credibility concerns about WDT's arguments.

Viasat also claims that even among the former employees in Texas that WDT identified, evidence suggests they possess relevant information. It points to three individuals who appear to have worked on the Accused Products based on evidence from documents WDT produced from its ████████████████████████████████████ ECF No. 90 at 7; ECF No. 90-3 at 27:21-30:5. Those individuals included Baskaran Kannan, Shaheer Hassan, and Raphael Ozioko. While WDT contends, and the Court agrees, that Viasat does not assert whether Baskaran Kannan and Shaheer Hassan are in this District, WDT relies only on Mr. Alrod's

testimony to assert that Mr. Ozioko had no "known" involvement in any ECC technologies, nor does he have "unique" knowledge. ECF No. 95 at 4. Again, given Mr. Alrod's limited credibility, the Court is not persuaded by WDT's assertion that Mr. Ozioko should not be considered a relevant witness.

Next, Viasat asserts that WDT's supply chain connections in this District could reveal relevant third-party witnesses. ECF No. 90 at 8–9. Viasat explains that Dell was responsible for 14% of WDT's net accounts receivable in 2019 as an OEM customer- a customer that buys WDT products like the accused flash memory products to embed in its own products. *Id.*; ECF No. 69-2, 459:20-460:6. Viasat claims that Dell has unique knowledge of WDT's alleged induced infringement, but that Mr. Alrod was not prepared to discuss the topic. ECF No. 90-2 at 456:17-22, 457:16-459:14. Viasat further contends that ▮▮▮▮▮▮▮▮▮ manufactures controllers in some of the accused products and has an office in Austin, but that Mr. Alrod, again, did not investigate this connection and was not prepared to discuss it at his deposition. ECF No. ECF No. 90-2 at 428:13-430:7. WDT replies that Viasat makes vague and conclusory allegations regarding Dell that fail to show whether it has relevant and material information. ECF No. 95 at 4. It also counters that regardless, it has customers throughout the United States, including many in the NDCA. As for ▮▮▮▮ WDT claims there is no evidence that any individual in the Austin office has relevant information and that it's more likely that relevant witnesses are at ▮▮▮▮ headquarters in the NDCA. ECF No. 95 at 5.

The Court is not persuaded by WDT's assertions, given that Viasat tried to elicit more information from Mr. Alrod and he was not prepared. WDT also does not explain why it is more likely witnesses at ▮▮▮▮s headquarters would possess relevant information, rather than ▮▮▮▮ witnesses in this District. The Court acknowledges Viasat's argument that Mr. Alrod was

unprepared to discuss Dell and ███ and is thus left without sufficient information to adequately weigh the relevancy of any potential witnesses in its analysis.

*Conclusion.* WDT has identified seven witnesses related to prior art, two former employees, and one prosecuting attorney all located within the subpoena power of the NDCA. Viasat has identified eight former employees with potentially relevant testimony. Given these facts, the Court finds that this factor is neutral.

### 4.   Practical Problems

When considering the private interest factors, courts must consider "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen II*, 545 F.3d at 314. "[G]arden-variety delay associated with transfer is not to be taken into consideration when ruling on a § 1404(a) motion to transfer" but delay in already protracted litigation may account for some weight. *In re Radmax*, 720 F.3d at 289.

"Particularly, the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor or against transfer." *PersonalWeb Techs., LLC v. NEC Corp. of Am., Inc.*, No. 6:11-cv-655, 2013 WL 9600333, at *5 (E.D. Tex. Mar. 21, 2013). The interests of justice may be best served by transferring ancillary matters pending in other forums to the forum of the main action, particularly if the main action is complex. *Bank of Texas v. Computer Stat., Inc.*, 60 F.R.D. 43, 45 (S.D. Tex. 1973). "[T]he ability to transfer a case to a district with numerous cases involving some overlapping issues weighs at least slightly in favor of such a transfer." *In re Apple*, 979 F.3d at 1344. But district courts should not rely "on considerations of judicial economy arising after the filing of the lawsuit or the transfer motion," such as suits filed in the transferor district after a request to transfer. *In re Netscout*, 2021 WL 4771756, at *12. Further, "the mere co-pendency of infringement suits in a particular district" does not automatically tip transfer in one direction or the other. *Id.* at *13.

21

WDT argues that this factor should be neutral. ECF No. 69 at 14. The Asserted Patents have not been asserted in any prior litigation, so WDT reasons that there are no efficiencies to be gained from this District's familiarity with the Asserted Patents. ECF No. 69 at 13. It also asserts that although Viasat has filed another case in this District against Kioxia America, Inc. and KIOXIA Corporation (collectively, "Kioxia"), that case involves only one of the Asserted Patents, the '700 patent, and Viasat accuses a completely different set of products. *Id.*; *see Viasat, Inc. v. KIOXIA Corp. et al.*, Case No. 6:21-cv-1231-ADA, D.I. 1 (W.D. Tex., Nov. 29, 2021). WDT maintains that "[i]t is thus 'likely that [Viasat's] cases will result in significantly different discovery, evidence, proceedings, and trial.'" ECF No. 69 at 13 (quoting *Samsung*, 2 F.4th at 1379-80.

Viasat contends that this factor should weigh against transfer because of the co-pending lawsuits in this District, and because transfer would result in delay. ECF No. 90 at 13. It contends that all parties have issued discovery and briefing on claim construction is complete. *Id.* But this case has not proceeded to a *Markman*, and "garden-variety delay associated with transfer is not to be taken into consideration when ruling on a § 1404(a) motion to transfer." *In re Radmax*, 720 F.3d at 289. The other Viasat case also has a pending motion to transfer, so the Court will not rule that the case weighs against transfer. *See In re Google*, 2021 WL 5292267, at *3. ("co-pending suits are not to be over-weighed if they are also subject to motions to transfer.").

*Conclusion.* Accordingly, the Court finds this factor neutral.

## C.    **Public Interest Factors**

### 1.    Court Congestion

The relevant inquiry under this factor is "[t]he speed with which a case can come to trial and be resolved." *In re Genentech*, 566 F.3d at 1347; *In re Apple*, 979 F.3d at 1343. A faster average time to trial means more efficient and economical resolutions of the claims at issue. That

said, "[a] court's general ability to set a fast-paced schedule is not particularly relevant to this factor." *In re Apple*, 979 F.3d at 1344. Moreover, when other relevant factors weigh in favor of transfer or are neutral, "then the speed of the transferee district court should not alone outweigh all of those other factors." *In re Genentech*, 566 F.3d at 1347.

WDT concedes that this District's time to trial is faster to trial than the NDCA by several months, but it argues that this difference is comparable, and thus this factor should be neutral. ECF No. 69 at 15. Viasat responds that WDT ignores that this District has completed 28 trials in the year ending March 31, 2022, whereas the NDCA had completed only nine. ECF No. 90 at 14. In its Reply, WDT re-urges that the time to trial statistics between districts are comparable and this Court has significantly more pending patent cases than the entirety of the NDCA, making this factor neutral. ECF No. 95 at 8.

The relevant inquiry under this factor is "[t]he speed with which a case can come to trial and be resolved." *In re Genentech*, 566 F.3d at 1347. Recent statistics show that the average time to trial in patent cases in the NDCA is now 45.2 months. *Billjco, LLC v. Apple Inc.*, No. 6:21-CV-00528-ADA, 2022 WL 607890, at *8 (W.D. Tex. Mar. 1, 2022). This Court has consistently been able to hold trials faster than NDCA, with an approximate time to trial of two years. *See, e.g., MV3 Partners v. Roku*, 6-18-CV00308 (W.D. Tex., filed Oct. 16, 2018) (23.7 months from case filing to trial); *CloudofChange, LLC v. NCR Corp.*, No. 6-19-CV-00513 (W.D. Tex., filed August 30, 2019) (20.3 months from case filing to trial); *VLSI Tech. LLC v. Intel Corp.*, No. 6-21-CV-00057 (W.D. Tex., filed Apr. 11, 2019) (22.4 months from case filing to trial); *Freshub, Inc. et al v. Amazon.Com Inc.*, No. 6-21- CV-00511 (W.D. Tex., filed Jun. 24, 2019) (23.7 months from case filing to trial); *ESW Holdings, Inc. v. Roku, Inc.*, No. 6-19-CV-00044 (W.D. Tex., filed Feb. 8, 2019) (25.9 months from case filing to trial); *Profectus v. Google*, 6-20-CV-00101 (W.D. Tex.,

filed Feb. 10, 2020) (19.6 months from case filing to trial); *Jiaxing Super Lighting v. CH Lighting Tech.*, 6-20-cv-00018 (W.D. Tex., filed Jan. 10, 2020) (21.7 months from case filing to trial); *VideoShare v. Google LLC*, 6-19-CV663 (W.D. Tex., filed Nov. 15, 2019) (23.8 months from case filing to trial); *NCS Multistage v. Nine Energy*, No. 6-20-cv-277 (W.D. Tex., filed Mar. 24, 2020) (21.8 months from case filing to trial); *EcoFactor, Inc. v. Google LLC*, No. 6-20-cv-00075 (W.D. Tex., filed Jan. 31, 2020) (24 months from case filing to trial); *Densys Ltd. v. 3Shape Trio A/S*, 6-19-CV-00680 (W.D. Tex., filed Nov. 26, 2019) (28.3 months from case filing to trial); *Appliance Computing III, Inc. v. Redfin Corp.*, No. 6-20-cv-00376-ADA (W.D. Tex., filed May 11, 2020) (24 months from case filing to trial).

*Conclusion.* The Federal Circuit has concluded that the speed of the transferee district should not alone outweigh all other factors. Thus, the Court finds that this factor weighs only slightly against transfer.

## 2. Local Interest

Under this factor, the Court must evaluate whether there is a local interest in deciding local issues at home. *Volkswagen II*, 545 F.3d at 317. Local interests in a patent case "are not a fiction." *In re Samsung*, 2 F.4th at 1380. "This factor most notably regards not merely the parties' significant connections to each forum writ large, but rather the 'significant connections between a particular venue and *the events that gave rise to a suit.*'" *In re Apple*, 979 F.3d at 1344 (quoting *In re Acer Am. Corp.*, 626 F.3d 1252, 1256 (Fed. Cir. 2010)) (emphasis in original). The Federal Circuit has accorded significant weight under this factor to the location where the accused product or functionality was "designed, developed, and tested." *In re Apple*, 979 F.3d at 1345. It has accorded no weight to the location of the sale of an accused product where that product is offered nationwide. *In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009). Courts should not heavily weigh a party's general presence in the forum. *In re Apple*, 979 F.3d at 1345. For

example, the Federal Circuit recently attributed error to this Court for granting even *some* weight to Apple's significant general presence in this District. *In re Apple Inc.*, No. 2022-137, 2022 WL 1676400, at *2 (Fed. Cir. May 26, 2022) ("The court's reliance on [the defendant's Austin] offices, which lack such a connection to the locus of the events giving rise to the dispute, amounts to a clear abuse of discretion").

"Important considerations include the location of the injury, witnesses, and the [p]laintiff's residence." *Def. Distributed*, 30 F.4th at 435. Yet the Federal Circuit has instructed that plaintiff's residence in the transferor forum is owed no weight if it is "recent and ephemeral." *In re Juniper Networks*, 14 F.4th at 1320 (quoting *In re Microsoft Corp.*, 630 F.3d 1361, 1365 (Fed. Cir. 2011)). The Federal Circuit has also clarified that a plaintiff's residence is owed zero weight if it lies beyond the transferor judicial district, even if just so. *See In re Apple*, 2022 WL 1676400, at *2 (granting little to no weight to the design, development, and testing of the claimed invention occurring just over 100 miles from the transferor court); *In re Google*, 2021 WL 4592280, at *6 (finding error with district court's reliance on plaintiff's office in Texas, where the office was located outside this District).

The Court finds this factor weighs slightly in favor of transfer. WDT argues that it has a significant U.S. presence in the NDCA, while no connection exists between this District and WDT's alleged acts of infringement. ECF No. 69 at 17. It asserts that its U.S.-based WDT engineers (and their teams) responsible for the design and development of the Accused Functionality— specifically, implementing the Sentinel Technology into various flash memory products—are based in WDT's offices in NDCA, that the NDCA would likely have a stronger interest in deciding the issues in this case. *Id.*

Viasat alternately contends that Israel is the control center for WDT's ECC work. ECF No.

90 at 1. It claims that WDT's connection that the NDCA is "made for litigation argument" because

WDT has maintained an active presence in this District for years, including incorporating and

acquiring large subsidiaries in the District that own intellectual property relating to ECC, and

maintaining ongoing support for a major purchaser of the accused products. ECF No. 90 at 15.

Viasat also points to WDT's former employees who worked on the Accused Products and the other

third parties with relevant evidence in this District. It shows, for example, that WDT has a wholly

owned subsidiary that is incorporated in Texas, and that this entity—Sandisk—owns 1,500 patents

(many of which relate to ECC and are asserted as prior art in this case), has upwards of $15 billion

in total assets, and is an active patent litigant. *See* ECF No. 90-7; ECF No. 90-3 at 110:22-113:10.

Both Mr. Carter and Mr. Alrod, when asked about SanDisk in their depositions, did not investigate

this entity and Mr. Alrod conceded that he had to ask in-house counsel about it between deposition

days. ECF No. 90-2 280:9-16. But WDT maintains that SanDisk is a holding company with no

employees. *Id.* at 2; ECF No. 90-5. It remains that Viasat tried to elicit information regarding

SanDisk from WDT's corporate representatives, and neither was prepared for this. The Court lacks

sufficient information to discern whether SanDisk's activities in this District, if any, are adequately

tethered to the events that gave rise to the suit.

WDT replies that "there can be no credible dispute that the NDCA has strong ties to this

case, with WDT's headquarters and key individuals involved in all facets of issues relevant to this

litigation." ECF No. 95 at 8. The Court notes that this is a change from WDT's original assertion

that "no connection exists" between this District and WDT's alleged acts of infringement. ECF

No. 69 at 17. Considering that several WDT employees in this District are involved in various

functions relating to the Accused Products, including engineering, customer-support, and sales, it

cannot be said that "no connection exists" between this District and WDT's alleged acts of infringement. *Id.* Nevertheless, the Court agrees that at least *some* significant events giving rise to this Action occurred in the NDCA. The presence of relevant witnesses and their access to sources of proof here does not comparably bind this Action to this District. Viasat contends that there might be more connections to this District but that because of WDT's conduct during venue discovery, it could not uncover those connections. ECF No. 90 at 15. The Court acknowledges this but is not in a position to speculate whether other connections exist that are sufficiently relevant to the events that gave rise to the suit.

*Conclusion.* On balance, the Court finds that this factor weighs slightly in favor of transfer.

### 3.   The Other Public Interest Factors are Neutral.

The Court finds, and the parties do not contest, that the other public interest factors are neutral. This Court and the NDCA are both familiar with patent law. And to the extent any conflicts of law arise, both courts are equally capable of addressing them.

## IV. CONCLUSION

Having considered the private and public interest factors, the Court's conclusions for each factor is summarized in the following table:

| Factor | The Court's Finding |
|---|---|
| Cost of attendance for willing witnesses | Neutral |
| Relative ease of access to sources of proof | Weighs slightly in favor of transfer |
| Availability of compulsory process to secure the attendance of witnesses | Neutral |
| All other practical problems that make trial of a case easy, expeditious and inexpensive | Neutral |
| Administrative difficulties flowing from court congestion | Weighs slightly against transfer |
| Local interest | Weighs slightly in favor of transfer |
| Familiarity of the forum with law that will govern case | Neutral |
| Problems associated with conflict of law | Neutral |

Five factors are neutral, two weigh slightly in favor of transfer, and one weighs slightly against transfer. Given the foregoing, the Court finds that WDT fails to meet its burden to show that the NDCA is a clearly more convenient forum.

**IT IS ORDERED** that Defendant Western Digital Technologies, Inc.'s Motion to Transfer Venue to the Northern District of California (ECF No. 69) is **DENIED**.

SIGNED this 12th day of December, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE