# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

|  |  |
|---|---|
| **VIASAT, INC.,** | |
| **Plaintiff,** | **Case No. 6:21-cv-01230-ADA** |
| **vs.** | **HEARING REQUESTED** |
| **WESTERN DIGITAL TECHNOLO-GIES, INC.,** | |
| **Defendant.** | |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR DISQUALIFICATION

### PUBLIC REDACTED VERSION

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ...................................................................................................3

        A.      Gibson Dunn's Limited Work on the Acacia Matter ............................3

        B.      Viasat Sues Western Digital for Patent Infringement .........................6

        C.      Ms. Kieckhefer Joins Gibson Dunn and Viasat Seeks to Limit Which
                Gibson Dunn Lawyers Can Represent Western Digital .......................7

III.    LEGAL STANDARD............................................................................................8

IV.     ARGUMENT ......................................................................................................10

        A.      Viasat Agreed to a Waiver of Conflicts When It Retained Gibson Dunn ..........10

        B.      The Acacia Matter Isn't Substantially Related to this Action ............13

        C.      Gibson Dunn's Ethical Screen Ensures That No Confidences Will Be
                Disclosed ............................................................................................17

        D.      This Motion Is an Effort to Gain a Tactical Advantage in This Litigation..........18

V.      CONCLUSION ...................................................................................................19

# TABLE OF AUTHORITIES

Page(s)

CASES

*Adaptix, Inc. v. Dell, Inc.*,
  No. 6:13CV437, 2014 WL 11730482 (E.D. Tex. Feb. 12, 2014)...................................13, 16

*In re Am. Airlines*,
  972 F.2d 605 (5th Cir. 1992)..................................................................................13, 15, 18

*Austin v. State Farm Lloyds*,
  No. A-16-CV-447-DAE, 2018 WL 1605755 (W.D. Tex. Jan. 2, 2018) .............................11

*Cinco Bayous, LLC v. Samson Expl., LLC*,
  No. 1:19-CV-452, 2020 WL 13533320 (E.D. Tex. Aug. 17, 2020)....................................17

*City of El Paso v. Salas-Porras Soule*,
  6 F. Supp. 2d 616 (W.D. Tex. 1998) ................................................................................16

*Conoco, Inc. v. Baskin*,
  803 S.W.2d 416 (Tex. App.—El Paso 1991, no writ)..........................................................9

*In re Dresser Indus., Inc.*,
  972 F.2d 540 (5th Cir. 1992)..........................................................................................8, 9

*FDIC v. U.S. Fire Ins. Co.*,
  50 F.3d 1304 (5th Cir. 1995)..........................................................................................8, 9

*Finalrod IP, LLC v. John Crane, Inc.*,
  No. 7:15-CV-97-DAE, 2016 WL 866930 (W.D. Tex. Mar. 3, 2016)...........................16, 17

*In re Fisker Auto. Holdings, Inc. S'holder Litig.*,
  No. CV 13-2100-DBS-SRF, 2018 WL 3991470 (D. Del. Aug. 20, 2018)..........................11

*Galderma Lab'ys, L.P. v. Actavis Mid Atl. LLC*,
  927 F. Supp. 2d 390 (N.D. Tex. 2013) ...............................................................11, 12, 19

*Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*,
  2011 WL 13201855 (N.D. Tex. Sept. 12, 2011) ...............................................................19

*Horaist v. Doctor's Hosp. of Opelousas*,
  255 F.3d 261 (5th Cir. 2001).............................................................................................9

*Maxwell, Ltd. v. Apple Inc.*,
  No. 5:19-CV-00036-RWS, 2021 WL 1100098 (E.D. Tex. March 2, 2021)........................18

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*,
    60 F. Supp. 3d 751 (W.D. Tex. 2014)......................................................................17, 18

*One World Foods, Inc. v. Stubb's Austin Rest. Co.*,
    2016 WL 6242121 (W.D. Tex. Oct. 25, 2016)..................................................................9

*In re ProEducation Int'l, Inc.*,
    587 F.3d 296 (5th Cir. 2009)..........................................................................................9

*In re Southwestern Bell Yellow Pages, Inc.*,
    141 S.W.3d 229 (Tex. App.—San Antonio 2004, no pet.)...............................................9

*Soverain Software LLC v. CDW Corp.*,
    No. 6:07 CV 511, 2010 WL 1038731 (E.D. Tex. Mar. 18, 2010) .......................................17

*Tankers v. M/T Swift Winchester*,
    2023 WL 1816858 (S.D. Tex. Feb. 8, 2023)....................................................................19

*In re Thetford*,
    574 S.W.3d 362 (Tex. 2019)...............................................................................9, 10, 13

*Viasat, Inc. v. Acacia Commc'ns, Inc.*,
    No. D077111, 2022 WL 1617118 (Cal. Ct. App. May 23, 2022)................................5, 6, 15

**RULES**

W.D. Tex. L.R. AT-7(a) ........................................................................................................9

## I.    INTRODUCTION

Viasat's motion to disqualify Gibson Dunn cannot be reconciled with the fact that Viasat has *twice* agreed to waive any conflicts that may arise from Gibson Dunn's representation of other clients like Western Digital.  The terms of those waivers are broad and unequivocal:

- "[Gibson Dunn] ***can continue to represent, or can in the future represent, existing or new clients in any matter***, ***including litigation or other adversarial proceedings*** . . . so long as the Other Matters are not substantially related to our work for Viasat . . . , ***even if those other clients' interests are adverse to Viasat's interests in the Other Matters***."

- "***Viasat waives any conflict of interest that might arise*** from the Firm's engagement in the Other Matters or with respect to the Other Issues, and ***will not seek to disqualify the Firm or any of the Firm's lawyers*** in, or assert a conflict with respect to, the Firm's engagement in the Other Matters or Other Issues."

Yet when Western Digital's counsel, Kieran Kieckhefer, left her former firm and joined Gibson Dunn in May 2023, Viasat saw an opportunity to gain a strategic advantage by claiming a conflict and seeking to bar qualified Gibson Dunn patent attorneys from working on this matter.  Viasat's position is inconsistent with its contract with Gibson Dunn, the facts related to Gibson Dunn's prior limited engagement in an unrelated appellate matter, and Viasat's own conduct.

Viasat doesn't dispute that it waived future conflicts to retain Gibson Dunn.  And it doesn't dispute that those waivers are valid and enforceable.  Instead, Viasat attempts to avoid those waivers by asserting—in a single conclusory footnote—that they don't apply here because this action is supposedly "substantially related" to a separate case involving Acacia that involved claims for breach of a license agreement and misappropriation of trade secrets related to forward-error-correction ("FEC") technology in ***non-flash*** memory.  But Viasat never suggested that this case has anything to do with Acacia *before* Ms. Kieckhefer joined Gibson Dunn, and Viasat's position has been that ████████████████████████████████████████████."  Kieckhefer Decl., Ex. E at 1 (emphasis added).

For example, ████████████████████████████████████████████ ████████.  *Id.*, Ex. C  at 4-5.  When Western Digital sought discovery concerning products

incorporating non-flash FEC technology, Viasat objected on the ground that it was "█████████

███████████████████████████████████████████████████████████████

████████████████." *Id.*, Ex. D at 8-9, 11.  And although Viasat now claims that the "license

litigated in *Acacia* will inform the damages Western Digital owes Viasat in this case," Dkt. 135 at

8, Viasat didn't identify or produce that license in its Rule 26 initial disclosures or in response to

an interrogatory seeking "all facts upon which Plaintiff relies for the proof of the existence and

amount of damages" and "all documents on which Plaintiff will rely to prove such damages." *Id.*,

Ex. A at 7; *see also* Ex. B at 23, 33-34.

Gibson Dunn's involvement in this case won't prejudice Viasat in the slightest.  ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████ And Gibson Dunn has already implemented an ethical

screen walling off the attorneys who worked on Acacia and other Viasat matters and any docu-

ments or files associated with those matters.  Viasat doesn't dispute that a screen of some variety

could sufficiently addresses its concerns—in fact, it requested one.

The problem is that Viasat requested a screen that would have walled off *all* attorneys who

worked at Gibson Dunn before July 2022 (when the Acacia appeal concluded)—even attorneys

who hadn't been involved in Acacia or any other Viasat matters.  That arbitrary proposal has no

legal basis and would significantly prejudice Western Digital's defense, as it would exclude virtu-

ally all of Gibson Dunn's patent lawyers from working with Ms. Kieckhefer on this matter.  The

only explanation for this requested screen is that Viasat is not actually concerned with any conflict

of interest, but simply wants to use Ms. Kieckhefer's move to Gibson Dunn as a way to advance

its position in this case against Western Digital by depriving it of the counsel of its choice.

Viasat long ago willingly waived the conflicts it now claims require disqualification.  It

now invokes those waived conflicts in what appears to be a strategic effort to gain a litigation

advantage over Western Digital.  The Court should enforce the waivers and deny the motion.

## II.   BACKGROUND

**A.   Gibson Dunn's** ███████████████████████

In February 2020, Viasat retained Gibson Dunn in connection with an appeal involving its litigation with a company called Acacia.  Lipshutz Decl., ¶ 5, Ex. B.[1]  Viasat's Associate General Counsel signed the engagement agreement.  *Id.*, Ex. B at 4.  That agreement includes an express waiver of conflict which provides, in relevant part:

- that Gibson Dunn "can continue to represent, or can in the future represent, existing or new clients in any matter, including litigation or other adversarial proceedings (which includes bankruptcy or insolvency proceedings, including where Viasat is a creditor or equity holding in such a proceeding) ('Other Matters'), so long as the Other Matters are not substantially related to [Gibson Dunn's] work for Viasat on the Acacia appeal, even if those other clients' interests are adverse to Viasat's interests in the Other Matters," and

- that "Viasat waives any conflict of interest that might arise from the Firm's engagement in the Other Matters . . . , and will not seek to disqualify the Firm or any of the Firm's lawyers in, or assert a conflict with respect to, the Firm's engagement in the Other Matters."

*Id.* at 2-3. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

---

[1] Viasat had previously (in October 2017) engaged Gibson Dunn in connection with a dispute with ████████  Lipshutz Decl., ¶ 3, Ex. A.  Viasat's Associate General Counsel signed the engagement agreement, which contains an identical conflict waiver.  *Id.*, Ex. A at 2-4.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

The Acacia appeal concerned a license agreement between Viasat and Acacia.  Cochrane Decl., Ex. B at Ex. A.[2]  The license agreement covered two categories of information—Foreground Information and Background Information.  *Id.* at ¶¶ 1(j), 1(b).  Foreground Information involved digital signal processing, *id.* at ¶ 1(j), and Background Information involved soft decision FEC, *id.* at ¶ 1(b).  Acacia owned the Foreground Information while Viasat retained ownership of the Background Information.  *Id.* at ¶¶ 1(b), 3(a), 8(a).  The agreement defined the "licensed materials" to include not only the Background Information, but also manuals and documentation that Viasat provided, and also defined the "licensed products" to include any product incorporating the licensed materials.  *Id.* at ¶ 1(k), (*l*).

In 2016, Viasat sued Acacia in California state court for breach of contract, breach of the implied covenant of good faith and fair dealing, and trade secret misappropriation, alleging it would have been impossible for Acacia to develop backwards-compatible products without using the Background Information.  *Id.*, Ex. B.  An unredacted copy of the license agreement was attached to the publicly filed complaint.  *Id.* at Ex. A.

Acacia removed the case to federal court.  *Id.*, Ex. D.  Acacia argued that Viasat's claims raised a substantial question of federal law because Viasat later filed patent applications containing the Foreground Information.  *Id.*, ¶¶ 5-6, 16.  Acacia claimed it owned the Foreground Information and so had an equitable right in the Viasat patents.  *Id.*, ¶ 15.  That same day, Acacia filed a federal-

---

[2] All information regarding the Acacia matter is based on publicly available filings.

4

law counterclaim for patent misappropriation. *Id.*, Ex. C, Dkt. 3. The notice of removal referenced numerous patents. *Id.*, Ex. D, ¶ 13. None is at issue here.

After litigating in federal court for two years, the parties moved for summary judgment. Acacia moved for summary judgment on Viasat's trade secret claim. *Id.*, Ex. E. In its motion, Acacia identified several patents that supposedly disclosed Viasat's alleged trade secrets. *Id.* at 13-22. None is at issue here. The federal court ultimately determined that there was no issue of federal patent law involved in the case and remanded it to California state court, *id.*, Ex. F, where it went to trial in 2019. *Viasat, Inc. v. Acacia Commc'ns, Inc.*, No. D077111, 2022 WL 1617118, at *4 (Cal. Ct. App. May 23, 2022).

The jury found that Acacia breached the license agreement and awarded damages of $49,303,982. *Id.* at *5. The jury also found Acacia liable for breach of the implied covenant and awarded the same amount of damages. *Id.* On trade secret misappropriation, the jury found that Acacia willfully and maliciously misappropriated Viasat's trade secrets but awarded only $1 in damages. *Id.* Both parties filed post-trial motions, which the trial court denied. *Id.* at *5-6. Both parties appealed. Cochrane Decl., Ex. A, Dkt. 835, 844.

Acacia argued on appeal that insufficient evidence supported the finding that Acacia breached the license agreement, that the trial court erred in not giving its proffered instructions, that the license agreement capped damages, that the implied covenant claim failed as a matter of law because the license agreement covered the conduct at issue, and that the misappropriation claim failed because Viasat authorized Acacia's use of its alleged trade secrets. *See Viasat*, 2022 WL 1617118 at *6-7, 16, 23-24.

Viasat argued on appeal that it was entitled to a new trial on its trade secret claim because the jury awarded only nominal damages and that the trial court erred in declining to award costs. Cochrane Decl., Ex. H at 105-111, 112-120. Viasat argued that California's Uniform Trade Secrets Act doesn't authorize an award of nominal damages and that the jury's award of $1 wasn't supported by the evidence. *Id.* at 105-111. Viasat explained that the jury found that Acacia's conduct was both willful and malicious, and that even Acacia's expert admitted that Viasat's trade

secret damages might be somewhere between $1 million and $34 million. *Id.* at 109-110. The California Court of Appeal affirmed the judgment as to Viasat's claim for breach of contract, but reversed as to Viasat's claims for breach of the implied covenant and trade secret misappropriation. *Viasat*, 2022 WL 1617118, at *1, 30.

**B.     Viasat Sues Western Digital for Patent Infringement**

In this patent-infringement action, Viasat alleges that Western Digital makes and sells products that infringe two Viasat patents, U.S. Patent Numbers 8,615,700 (the '700 patent) and 8,966,347 (the '347 patent). Dkt. 1 at ¶ 8. The '700 and '347 patents describe "[m]ethods, systems, and devices . . . for forward error correction for flash memory." Dkt. 135-61, Dkt. 135-62. Viasat alleges that Western Digital's NAND-flash-memory-containing products implement the '700 and '347 patents' forward-error-correction technology. Dkt. 1, ¶¶ 8, 45, 61, 73.

Western Digital retained Ms. Kieckhefer, then a partner at Shearman & Sterling, to defend the company against Viasat's claims. Kieckhefer Decl., ¶ 3. Five other Shearman attorneys joined her. Dkt. 28-32. Since this Court entered a scheduling order in May 2022, Dkt. 43, there has been extensive written discovery, including requests for production and interrogatories, multiple meet and confers regarding discovery issues, and discovery disputes that were heard and adjudicated by this Court. Kieckhefer Decl., ¶ 4.

In discovery, Viasat has drawn a sharp distinction in this case between the use of forward-error-correction technology in "flash memory," on the one hand, and "prior memory technology," on the other. Dkt. 1 at ¶ 1. For instance, Viasat alleged in its complaint that "[f]lash memory has revolutionized computing, personal technology, gaming, enterprise data storage, and e-commerce," and that as a result of its "widespread adoption," "computer memory has shifted from a physical rotating platter storing magnetic ones and zeroes to solid-state flash memory holding electric charges with no moving parts and few of the limitations that plagued prior memory technology." *Id.*

Viasat has also objected to discovery relating to non-flash memory products—including the Acacia products. Viasat took the position that ███████████████████████████

6

██████████████████████████████████████████████████

████████,” and that █████████████████████████████████████████████.”

Kieckhefer Decl., Ex. E at 1.   And Viasat served interrogatory responses stating that ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████.”  *Id.*, Ex. C at 4-5.

### C.   Ms. Kieckhefer Joins Gibson Dunn and Viasat Seeks to Limit Which Gibson Dunn Lawyers Can Represent Western Digital

On May 19, 2023, Ms. Kieckhefer joined Gibson Dunn as a Partner in the firm's San Francisco Office.  Kieckhefer Decl., ¶ 2, 8.  Before she joined the firm, out of an abundance of caution, Gibson Dunn implemented an ethical screen.  Fogelman Decl., ¶¶ 4-5.  The screen provides that no lawyer who worked on a Viasat matter may work on a Western Digital matter or communicate with any lawyer working on a Western Digital matter, and that no lawyer working on a Western Digital matter may access information, files, or materials relating to the Viasat matters.  *Id.*, ¶ 8.  Western Digital is a long-standing client of Gibson Dunn, and the firm represented Western Digital long before it was engaged by Viasat on the Acacia appeal.  *Id.*, ¶ 4.

A week later, Viasat's counsel emailed Ms. Kieckhefer, claiming that "Gibson Dunn has a conflict with Viasat" but that "Viasat has been trying to work with Gibson Dunn to establish an ethical screen that would allow the lawyers currently involved in this case to remain so."  *Id.*, ¶ 9, Ex. F.  Ms. Kieckhefer responded by denying that Gibson Dunn had represented Viasat in a substantially related matter, and proposed that the case be stayed while the parties worked to resolve the issue.  *Id.*  Viasat's counsel rejected the proposed stay but stated that Viasat would agree to Ms. Kieckhefer's continued representation of Western Digital so long as "no new Gibson Dunn lawyers are added to this matter."  *Id.*  Such an arrangement, Viasat's counsel claimed, "would maintain the status quo for Western Digital."  *Id.*

In response, Ms. Kieckhefer confirmed that "there is an ethical screen in place between lawyers assisting Western Digital and any lawyers who have advised Viasat on other matters," that

no member of the Gibson Dunn team representing Western Digital has accessed or will access any confidential information Viasat may have provided in connection with any other matter, and that no member of the Gibson Dunn team has spoken with the lawyers who worked on the Viasat matters regarding such matters.  *Id.*  But Ms. Kieckhefer made clear that Viasat's proposed screen was unworkable: "As you know, not everyone on my team will be joining Gibson Dunn and, in fact, no partner will be joining me from Shearman.  We have needed and will continue to need support from other lawyers at [Gibson Dunn]."  *Id.*

Viasat responded by again expressing its willingness "to allow you personally to continue representing Western Digital as lead counsel," so long as no Gibson Dunn attorney who had been working at the firm as of July 2022 worked on the matter.  *Id.*.  When Gibson Dunn again made clear that any such limitation was unworkable as it would preclude virtually every lawyer at Gibson Dunn with patent litigation experience from working on the matter, Viasat filed this motion.

Shortly after, Viasat informed Western Digital's counsel that it had made a production of documents.  *Id.*, ¶ 10.  Even though the Protective Order includes no such designation, Viasat designated the production "Highly Confidential – Attorney's Eyes Only" and instructed Western Digital's remaining counsel at Sherman not to share the production with any Gibson Dunn lawyers.  *Id.*

### III.    LEGAL STANDARD

"Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law."  *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992).  In "generic civil case[s]" like this one, a motion to disqualify is "governed by the ethical rules announced by the national profession in the light of the public interest and the litigants' rights."  *Id.*  Although "[t]he norms embodied in the [ABA] Model Rules [of Professional Conduct] and the [ABA] Model Code [of Professional Responsibility] are relevant to [this] inquiry," "consideration of the Texas Rules is also necessary, because they govern attorneys practicing in Texas generally[.]"  *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995).  "When considering motions to disqualify, courts should first look to 'the local rules

promulgated by the local court itself.'" *In re ProEducation Int'l, Inc.*, 587 F.3d 296, 299 (5th Cir. 2009) (quoting *U.S. Fire Ins.*, 50 F.3d at 1312). Here, those are the Texas Disciplinary Rules of Professional Conduct. W.D. Tex. L.R. AT-7(a); *see One World Foods, Inc. v. Stubb's Austin Rest. Co.*, 2016 WL 6242121, at *3 (W.D. Tex. Oct. 25, 2016) ("In deciding a motion to disqualify, the Court considers both the Texas Disciplinary Rules of Professional Conduct (Texas Rules) and the American Bar Association's (ABA) Model Rules.").

When assessing a motion to disqualify, courts "view the[se] rules in light of the litigant's rights and the public interest, considering 'whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case.'" *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001) (quoting *In re Dresser*, 972 F.2d at 544). Courts must bear in mind that "[d]epriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration." *U.S. Fire Ins.*, 50 F.3d at 1313. And "[b]ecause of the severity of disqualification, [courts] do not apply disqualification rules 'mechanically,' but [they] consider '[a]ll of the facts particular to [the] case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights.'" *In re ProEducation*, 587 F.3d at 300 (quoting *U.S. Fire Ins.*, 50 F.3d at 1314).

"While not encouraged, concurrent representation of adverse clients is permitted in Texas." *In re Southwestern Bell Yellow Pages, Inc.*, 141 S.W.3d 229, 231 (Tex. App.—San Antonio 2004, no pet.). Rule 1.06(b)(1) of the Texas Disciplinary Rules of Professional Conduct "prohibits representation of one client in a matter bearing a substantial relationship to the representation of another client when those clients' interests are directly adverse to each other." *Conoco, Inc. v. Baskin*, 803 S.W.2d 416, 419 (Tex. App.—El Paso 1991, no writ). Matters are substantially related "when the similarity of the facts involved creates a genuine threat that confidences revealed to [the client's] former counsel will be divulged to his present adversary." *In re Thetford*, 574 S.W.3d 362, 374 (Tex. 2019) (alterations in original) (quotation marks omitted). "Neither conclusory

statements of similarities nor facial similarities will suffice—the movant must delineate specific facts that tie the former and current representations together.  But while producing specific overlapping facts is necessary to show substantial relation, it is not sufficient.  The test is whether those facts create a genuine threat of disclosure." *Id.* (quotation marks omitted).

## IV.    ARGUMENT

### A.    Viasat Agreed to a Waiver of Conflicts When It Retained Gibson Dunn

When Viasat engaged Gibson Dunn in February 2020 for the Acacia appeal, Gibson Dunn informed Viasat, in writing, that "[i]t is possible that during or after the time we represent Viasat, other present or future clients will ask us to represent them in disputes or transactions with or involving Viasat (which includes any related persons or entities) as to legal matters not substantially related to our representation of Viasat."  Lipshutz Decl. Ex. B at 2.  The February 2020 engagement agreement expressly provided that "[a]s a condition of our undertaking this matter, Viasat agrees that . . . we can continue to represent, or can in the future represent, existing or new clients in any matter, ***including litigation or other adversarial proceedings*** (which includes bankruptcy or insolvency proceedings, including instances where Viasat is a creditor or equity holder in such proceeding) ('Other Matters'), so long as the Other Matters are not substantially related to our work for Viasat on the Acacia appeal, even if those other clients' interests are adverse to Viasat's interests in the Other Matters." *Id.* (emphasis added).

By signing the engagement agreement, Viasat expressly agreed that "Viasat waives any conflict of interest that might arise from the Firm's engagement in the Other Matters or with respect to the Other Issues, and will not seek to disqualify the Firm or any of the Firm's lawyers in, or assert a conflict with respect to, the Firm's engagement in the Other Matters or Other Issues." *Id.* at 3.  Viasat also signed an engagement agreement in October 2017 that contained this same waiver.  Lipshutz Decl., Ex. A at 2-3.

In a footnote in its disqualification motion, Viasat acknowledges that the engagement agreements it signed include advance waivers of future conflicts arising from substantially unrelated matters.  Mot. at 11 n.6.  Viasat doesn't challenge the enforceability or validity of those

waivers, and has forfeited any such challenge by failing to make it in its opening brief.  *See, e.g.*, *Austin v. State Farm Lloyds*, No. A-16-CV-447-DAE, 2018 WL 1605755, at *2 (W.D. Tex. Jan. 2, 2018) (disregarding "new arguments raised for the first time in [a] reply brief" because "[t]he point of a reply brief is to reply to the non-movant's arguments, not raise new arguments to which the non-movant will not have an opportunity respond").  The lack of any challenge to the enforce-ability or validity of the waivers is for good reason:  they are plainly enforceable, particularly in light of their unambiguous language and Viasat's sophistication.

The waivers clearly spell out that (1) "[Gibson Dunn] can continue to represent, or can in the future represent, existing or new clients in any matter, including litigation or other adversarial proceedings . . . , so long as the Other Matters are not substantially related to our work for you on the Acacia appeal, even if those other clients' interests are adverse to you in the Other Matters," and (2) "Viasat waives any conflict of interest that might arise from the Firm's engagement in the Other Matters or with respect to the Other Issues and will not seek to disqualify the Firm or any of the Firm's lawyers in, or assert a conflict with respect to, the Firm's engagement in the Other Matters or Other Issues."  Lipshutz Decl., Ex. B at 2-3.  Further, the waiver informs Viasat of the material risk that, if Viasat waives the conflict, Gibson Dunn can represent existing or future clients "even if those other clients' interests are adverse to you," including in litigation or other proceed-ings.  *Id.*  This is the exact sort of clear and unambiguous language that constitutes informed con-sent under Model Rule 1.0(e), particularly given that Viasat is undisputedly a sophisticated client.

Courts routinely enforce conflict waivers like this one—indeed, another federal district court denied a motion seeking to disqualify Gibson Dunn after upholding the very same waiver provisions.  *See In re Fisker Auto. Holdings, Inc. S'holder Litig.*, No. CV 13-2100-DBS-SRF, 2018 WL 3991470, at *3 (D. Del. Aug. 20, 2018).  And in *Galderma Lab'ys, L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 399 (N.D. Tex. 2013), the court upheld a conflict waiver with very similar language to that here, holding that the party seeking disqualification was a sophisticated client represented by in-house counsel when it elected to sign the engagement agreement

containing the waiver. [3]  *Id.* at 401-406.  The court recognized that "a general, open-ended waiver" is "likely to be effective when the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation." *Id.* at 397.

Like the clients in *Fisker* and *Galderma*, Viasat provided informed consent for the waiver it signed.  Viasat is a highly sophisticated client.  By its own admission, it "is a global communications company, with significant expertise in engineering satellite, terrestrial wireless, and optical communications solutions" that "currently provides high-speed internet service to nearly 1,500 commercial airliners, has over 500,000 residential broadband subscribers in the U.S., and employs over 5,800 employees in over 60 offices around the world," "generating $2.3 billion in revenues in fiscal 2021."  Dkt. 1 ¶¶ 4, 28.  Viasat is also experienced in hiring large national law firms and has its own legal department.  And it was represented by independent counsel in agreeing to the waiver, as Viasat's Associate General Counsel, Colin Ward, signed the two engagement agreements with Gibson Dunn containing identical waivers.  Lipshutz Decl., *Id.*, Ex. B at 4; *see also id.*, Ex. A at 4. [4]

While it doesn't challenge the enforceability of the conflict waivers, Viasat argues that Gibson Dunn is performing other ongoing work for Viasat that isn't covered by any formal

---

[3] The waiver in *Galderma* provided, "We recognize that we shall be disqualified from representing any other clients with interests materially and directly adverse to yours . . . in any matter which is substantially related to our representation of you . . . and agree that, with those exceptions, we are free to represent other clients, including clients whose interests are in conflict with yours in litigation."  *Galderma*, 972 F. Supp. 2d at 399.

[4] The other requirements of Model Rule 1.7(b) are also satisfied, including: (1) the lawyer reasonably believes the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.  Model Rule 1.7(b).  Gibson Dunn reasonably believes that it will be able to provide competent and diligent representation to each affected client. Lipshutz Decl., ¶ 14; Kieckhefer Decl., ¶ 11. ████████████████████████ will not affect Gibson Dunn's representation of Western Digital in this unrelated patent case, nor will that representation affect any ongoing work for Viasat in unrelated matters.

engagement agreement, so no waiver applies to those current matters. Mot. at 11 n.6. This ignores that both the 2017 and 2020 engagement agreements specifically provide that, "[u]nless otherwise agreed in writing, the terms of this letter and the attached Terms of Retention will also apply to any additional matters we handle on behalf of Viasat and any affiliate of Viasat for whom we also provide legal services, as to which you represent that you have the authority to bind such affiliates to this letter." Lipshutz Decl., Ex. B at 1; *see also id.*, Ex. A at 1. So the conflict waiver, like all of the other terms in the 2017 and 2020 agreements, equally applies to all other Viasat matters (none of which it claims are related to this action).

## B.    The Acacia Matter Isn't Substantially Related to this Action

Viasat's primary argument for avoiding the waivers it previously agreed to is that, in Viasat's view, this action is "substantially related" to Gibson Dunn's limited ███████████ ███. Not so.

As an initial matter, the Fifth Circuit has made clear that "a substantial relationship may be found only after the moving party delineates with specificity the subject matters, issues and causes of action common to prior and current representations and the court engages in a painstaking analysis of the facts and precise application of precedent." *In re Am. Airlines*, 972 F.2d 605, 614 (5th Cir. 1992) (quotation marks omitted). In determining substantial relatedness, "courts have identified three relevant factors: (1) the factual similarities between the current and former representations, (2) the similarities between the legal question posed, and (3) the nature and extent of the attorney's involvement with the former representation." *Adaptix, Inc. v. Dell, Inc.*, No. 6:13CV437, 2014 WL 11730482, at *7 (E.D. Tex. Feb. 12, 2014) (quotation marks omitted). Viasat hasn't come close to carrying its burden of proving substantial relatedness as to any of these three factors, much less as to all of them, which is reason enough to deny its motion.

*First*, Viasat doesn't demonstrate any factual similarities between the Acacia appeal and this action, despite having the obligation to do so with specificity. *See, e.g.*, *In re Am. Airlines*, 972 F.2d at 614; *In re Thetford*, 574 S.W.3d 362, 373-74 (Tex. 2019). The Acacia appeal involved claims for breach of a license agreement and misappropriation of trade secrets. By contrast, this

13

is a patent-infringement action.  While Viasat suggests (at 3) that the Acacia license agreement involved similar technology, that position contradicts Viasat's own litigation conduct in drawing a sharp distinction between FEC in flash memory and the use of its technology in the Acacia license agreement—stating that ██████████████████████████████████████████████ ██████.″ Kieckhefer Decl., Ex. E at 1.

Consistent with that distinction, ████████████████████████████████████ ████████████████████████████████████.  *Id.*, Ex. C at 4-5 ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████).  Viasat doesn't explain how its prior positions can be reconciled with its new claim that the Acacia action is substantially related to the infringement claims here.  Nor does Viasat explain how its alleged trade secrets in the Acacia case are similar to the patents-in-suit.  While Acacia argued that certain Viasat patents disclosed Viasat's alleged trade secrets, none is one of the patents-in-suit.  So it isn't surprising that Viasat never claimed the matters were related—let alone substantially related—until Ms. Kieckhefer moved to Gibson Dunn.

*Second*, Viasat doesn't (and can't) demonstrate any similarities between the issues posed. In the Acacia appeal, the issues were whether:

(1) substantial evidence supported the jury's finding that Acacia breached the license agreement by failing to pay royalties on the backwards-compatible products,

(2) the trial court erred by failing to give Acacia's proffered instructions,

(3) the license agreement capped damages,

(4) the implied covenant claim failed because the license agreement covered the alleged conduct,

(5) the trade secret misappropriation claim failed because Viasat authorized Acacia's use of its alleged trade secrets,

(6) nominal damages could be awarded for trade secret misappropriation where the jury found that the misappropriation was willful and malicious and where Acacia's own expert opined that the alleged trade secrets were worth more than $1 dollar, and

(7) the trial court erred in failing to award costs.

*See generally Viasat,* 2022 WL 1617118.  None of these issues is present in this matter, in which the issues are instead focused on alleged patent infringement that have nothing to do with California law or Viasat trade secrets.

    ***Third***, ███████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████

    What's more, Viasat makes no attempt to "delineate[] with specificity" any similarities.  *In re Am. Airlines*, 972 F.2d at 614. ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

██████████████ None of these things establishes a substantial relationship.



None of these things is confidential.  The license agreement was filed publicly, the parties exchanged expert reports, and Viasat's alleged trade secrets were disclosed to Acacia.  All were the subject of extensive testimony and briefing, and all were part of the record on appeal.  ███████████████████████████████████████ ████████████████████████████████████.  And on top of all that, Viasat has made no showing there is a "reasonable probability" that any of this information "could be used to [Viasat's] disadvantage" here.  *City of El Paso v. Salas-Porras Soule*, 6 F. Supp. 2d 616, 624 (W.D. Tex. 1998).

Texas federal courts have found no substantial relationship in cases where the facts and issues were far more similar than here.  For instance, in *Adaptix*, the court found no substantial relationship between two patent cases involving Dell products because one matter involved Dell-branded printers while the other involved Dell's laptops, and because the allegedly conflicted attorneys' involvement in the former matter wasn't significant.  *Adaptix*, 2014 WL 11730482, at *8. "Considering the lack of significant factual similarity between the *Lodsys* and *Adaptix* matters, and the limited extent of [the attorneys'] roles in the [former] matter," the court found that Dell hadn't shown a substantial relationship.  *Id.*

Similarly, in *Finalrod IP, LLC v. John Crane, Inc.*, No. 7:15-CV-97-DAE, 2016 WL 866930, at *5 (W.D. Tex. Mar. 3, 2016), the court found no substantial relationship even though both matters involved the same patent.  The court concluded that "[t]he prosecution and assignment of the '431 patent by the Matthews firm is not substantially related to the matters in this case where

the firm is defending Plaintiffs in a lawsuit against infringement of the '431 patent," because "[v]alidity and infringement are distinct issues, bearing different burdens, different presumptions, and different evidence." *Id.* (quotation marks omitted). So the defendant hadn't carried its burden of "specifically delineat[ing] the matters, issues, and causes of action common to these two representations." *Id.* (quotation marks omitted). As the court put it, disqualification "requires more than that two cases involve the same patent." *Id.*

Here, the two matters involve different legal claims, different products, and different patents. This case doesn't involve a dispute over the breach of a license agreement or the misappropriation of trade secrets, as the Acacia case did—this case involves the entirely distinct issue of alleged patent infringement. At most, Viasat argues that the Acacia license agreement will potentially be relevant to the calculation of Viasat's alleged damages, and that some of the engineers who were witnesses in the Acacia case may be witnesses here. Dkt. 135 at 7-8. But the Acacia license agreement is publicly available. And to the extent Viasat intends to use the license agreement or witnesses from the Acacia matter (none of whom Gibson Dunn worked with) in this action, it will be for "dissimilar reasons and context." *Cinco Bayous, LLC v. Samson Expl., LLC*, No. 1:19-CV-452, 2020 WL 13533320, at *6 (E.D. Tex. Aug. 17, 2020).

In any event, Viasat fails to specify what confidential information was imparted to Gibson Dunn regarding the license agreement that isn't already reflected in the public record and that could be used to disadvantage Viasat here. "A severe remedy such as disqualification cannot be granted on generalities." *Soverain Software LLC v. CDW Corp.*, No. 6:07 CV 511, 2010 WL 1038731, at *4 (E.D. Tex. Mar. 18, 2010).

**C.     Gibson Dunn's Ethical Screen Ensures That No Confidences Will Be Disclosed**

"[U]nder Fifth Circuit precedent, there is no established irrebuttable presumption [that] a lawyer shares client confidences he possesses with other lawyers at his law firm." *Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, 60 F. Supp. 3d 751, 762 (W.D. Tex. 2014). Rather, "to the extent there is still a presumption . . . the presumption is rebuttable." *Id.* at 762-63; *see*

*also Maxwell, Ltd. v. Apple Inc.*, No. 5:19-CV-00036-RWS, 2021 WL 1100098, at *8 (E.D. Tex. March 2, 2021).

Out of an abundance of caution, Gibson Dunn implemented an ethical screen that will prevent disclosure of any Viasat confidential information to attorneys representing Western Digital. Fogelman Decl., ¶¶ 4, 8. The screen prohibits any of the attorneys who have worked on Viasat matters from working on or otherwise participating in the representation of Western Digital in this action, and from discussing the Viasat matters with, or disclosing privileged or confidential information regarding those matters to, any attorney representing Western Digital in this case. *Id.* The screen further provides that no attorney representing Western Digital may access any documents, files, or other materials relating to the Viasat matters. *Id.* This screen is more than sufficient to ensure that no confidential information will be disclosed. *Nat'l Oilwell*, 60 F. Supp. 3d at 767.

Further, no information has been disclosed. Ms. Kieckhefer has never been exposed to any information (let alone privileged or confidential information) obtained by the attorneys who worked on the Viasat matters. Kieckhefer Decl., ¶ 8, 11. Nor have the attorneys who worked on the Viasat matters discussed this action or the Viasat matters with Ms. Kieckhefer, or vice versa. Lipshutz Decl., ¶ 13; Cochrane Decl., ¶ 6. To the extent that any presumption applies, the undisputed evidence that no confidences were shared rebuts it. *Maxell*, 2021 WL 1100098, at *8.

Indeed, Viasat has acknowledged the efficacy of ethical screens by proposing one itself in this case. Kieckhefer Decl., ¶ 9, Ex. F. While Ms. Kieckhefer rightly rejected the arbitrary scope of Viasat's proposed screen—which would have seriously compromised Western Digital's ability to defend itself in this case—Viasat's offer nonetheless confirms the propriety and efficacy of ethical screens, which Gibson Dunn has already put up in an abundance of caution.

**D.    This Motion Is an Effort to Gain a Tactical Advantage in This Litigation**

The Fifth Circuit has long recognized "that disqualification motions may be used as 'procedural weapons' to advance purely tactical purposes." *In re Am. Airlines*, 972 F.2d at 611. For example, "[s]ophisticated clients can retain their adversary's counsel of choice in unrelated matters while attempting to invalidate prospective waivers of future conflicts when that counsel later

becomes adverse to them." *Galderma Labs.*, 927 F. Supp. 2d at 395.  As the Southern District of Texas observed earlier this year, "'[t]he tactical use of attorney-misconduct disqualification motions is a deeply disturbing phenomenon in modern civil litigation.'" *Tankers v. M/T Swift Winchester*, 2023 WL 1816858, at *6 (S.D. Tex. Feb. 8, 2023) (quotation marks omitted).

Because "the purpose of the [ABA] rules can be subverted when they are invoked by opposing parties as procedural weapons," ABA Model Rules of Professional Conduct, Scope, cmt. 20, "'whether or not a motion to disqualify has been used as a tactical device or a means of harassment should also be considered,'" *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, 2011 WL 13201855, at *9 (N.D. Tex. Sept. 12, 2011).  Unfortunately, that is the situation here—and Viasat's own conduct confirms as much.

Viasat has never objected to having Ms. Kieckhefer—or certain of Gibson Dunn's lawyers—involved in this case.  On the contrary, Viasat made an "offer to accept an ethical wall that would allow Western Digital to keep Ms. Kieckhefer as counsel"—so long as "[a]ny lawyer at Gibson Dunn as of the remittitur in the initial *Acacia* appeal in July 2022 would be unavailable to work on this matter."  Kieckhefer Decl., ¶ 9, Ex. F.  Viasat offers no meaningful explanation why this screen is preferable to the one that Gibson Dunn has already imposed, which applies to Gibson Dunn lawyers who actually *worked on* Viasat matters.

The only possible explanation is that Viasat's true goal appears to be hamstringing Western Digital's ability to defend itself by limiting its litigation team to those lawyers with less than a year's tenure at Gibson Dunn.  But using disqualification as a sword to gain a tactical advantage in litigation is precisely what courts must guard against.  This Court should reject Viasat's attempt to "substantially prejudice" Western Digital by "depriving" it "of the superior skills, advanced technical knowledge, and unique perspective its chosen counsel has gained throughout the course of this particularly complex litigation." *Gen. Elec.*, 2011 WL 13201855, at *10.

## V.   CONCLUSION

The Court should deny the motion to disqualify.

DATED:  June 21, 2023                    Respectfully submitted,

*/s/    Allyson N. Ho*
Allyson N. Ho (Tex. Bar No. 24033667)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Email: AHo@gibsondunn.com


Kieran Kieckhefer (*admitted pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Email: KKieckhefer@gibsondunn.com

*Attorneys for Defendant Western Digital Technologies, Inc.*

## CERTIFICATE OF SERVICE

I certify that, on June 21, 2023, I caused a true and correct copy of the foregoing document to be electronically filed with the CM/ECF system of the United States District Court for the Western District of Texas, which will automatically send e-mail notification of such filing to all counsel of record.

/s/ Allyson N. Ho
Allyson N. Ho

*Attorney for Defendant Western Digital Technologies, Inc.*